## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Alaa M. K. A., | Case No. 20-cv-1066 (SRN/HB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Andrew Saul, Commissioner of Social Security, | |
| Defendant. | |

---

HILDY BOWBEER, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Alaa M. K. A. seeks judicial review of a final decision by the Commissioner of Social Security denying Plaintiff's application for supplemental security income. This matter is before the Court on Plaintiff's Motion for Summary Judgment [ECF No. 16], Defendant's Motion to Remand [ECF No. 24], and Defendant's Motion for Summary Judgment [ECF No. 36]. For the reasons set forth below, the Court recommends that the Commissioner's decision be reversed and the matter be remanded to the Social Security Administration pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings.

## I.    Introduction

Plaintiff is a refugee from Iraq who arrived in the United States in November 2015. (R. 525, 531.)[1] He applied for supplemental security income (SSI) benefits on

---

[1] The Social Security administrative record is filed at ECF No. 15. The Court cites to the record as "R." and uses the page numbers added by the Social Security Administration in

February 9, 2016, asserting disability because of post-traumatic stress disorder (PTSD) and depression.  (R. 15, 105.)  After several rounds of administrative review, Plaintiff's application was denied, and Plaintiff now seeks judicial review of the final decision of the Commissioner of Social Security.

Both parties have requested a remand to the Social Security Administration, but they disagree on the scope of the remand.  Plaintiff has described several alleged errors made by the Administrative Law Judge (ALJ) and seeks a remand for an immediate award of benefits.  The alleged errors include (1) the ALJ's finding that Plaintiff's depression and PTSD were not medically determinable impairments; (2) the weight given to the opinions of medical sources Dr. Georgi Kroupin, Dr. Alford Karayusuf, Dr. Craig Barron, and Dr. Chhabi Lall Timsina Sharma; (3) the ALJ's reliance on a Cooperative Disability Investigations (CDI) report; (4) the ALJ's failure to continue past step two of the five-step sequential evaluation described in 20 C.F.R. § 416.920(a)(4) and find Plaintiff disabled at step three, four, or five; and (5) the ALJ's failure to assess Plaintiff under a special vocational profile described in 20 C.F.R. § 416.962(b).  (Pl.'s Mem. Supp. Mot. Summ. J. at 3–4, 8–20, 24–38 [ECF No. 17].)

The Commissioner's request for remand is relatively narrow.  The Commissioner agrees the matter should be remanded for the ALJ to consider and determine the weight to be given to the March 7, 2016 medical opinion of Dr. Sharma.  That determination, in turn, may require the ALJ to reevaluate at step two whether Plaintiff has a severe,

---

the lower right corner of each page.

medically determinable impairment, the Commissioner concedes.  Further, if the ALJ

finds that Plaintiff has a severe, medically determinable impairment, the Commissioner

acknowledges the ALJ should then determine whether the current or former version of 20

C.F.R. § 416.962(b) applies to Plaintiff and apply the correct version.  (Def.'s Reply

Mem. Supp. Mot. Remand at 2, 5–6 [ECF No. 31].)

## II.    Procedural History

In a written decision issued on February 22, 2019, the ALJ concluded that Plaintiff

was not disabled and therefore not entitled to SSI benefits.  (R. 12.)  Title 20 C.F.R.

§ 416.920(a)(4) describes a five-step sequential evaluation process an ALJ must use to

determine whether an SSI claimant is disabled.[2]  If an ALJ determines at any step that the

claimant is disabled or not disabled, the sequential evaluation ceases at that step.  20

C.F.R. § 416.920(a)(4).

In Plaintiff's case, the ALJ found at the first step that Plaintiff had not engaged in

substantial gainful activity since February 9, 2016.  (R. 17.)  At the second step, the ALJ

concluded that Plaintiff had medically determinable impairments of myopia, astigmatism,

or presbyopia; cataracts; hypertension; bradycardia; latent tuberculosis; left knee pain;

and gastroesophageal reflux disease.  (R. 17–18.)  The ALJ rejected several other claimed

impairments—PTSD, depression, and other psychiatric disorders—as medically

---

[2] The five steps of the sequential evaluation are (1) whether the claimant's work activity
was substantial gainful activity; (2) the medical severity of the claimant's impairments;
(3) whether one or more impairments meets or medically equals the criteria of a listed
impairment, and meets the duration requirement; (4) the claimant's residual functional
capacity (RFC) and past relevant work; and (5) the claimant's RFC and whether he can
make an adjustment to other work.  20 C.F.R. § 416.920(a)(4)(i)–(v).

determinable impairments.  (R. 18.)  The ALJ determined that none of Plaintiff's

medically determinable impairments, alone or in combination, significantly limited his

ability to do basic work activities for twelve consecutive months.  (*Id.*)

In making this determination, the ALJ considered hearing testimony from Plaintiff

and Plaintiff's sister-in-law about the claimed intensity, persistence, and limiting effects

of Plaintiff's symptoms, but determined the testimony was not entirely consistent with

the medical and other evidence of record.  (R. 19–20.)  Plaintiff testified that his sister-in-

law fed him, dressed him, bathed him, and took him everywhere, even outside.  (R. 55.)

Plaintiff's sister testified that Plaintiff was traumatized after he found his brother

murdered in their home in Iraq, that Plaintiff shook and often cried when he first arrived

in the United States, that Plaintiff's shaking and crying had improved recently with

treatment, and that Plaintiff could not leave the house alone, eat alone, or "do anything."

(R. 57–61, 70.)

The ALJ gave great weight to state agency medical consultants' opinions that

Plaintiff's hypertension, bradycardia, dizziness, eyesight, knee pain, and ability to

ambulate were normal or controlled.  (R. 20–21.)  Medical records of Plaintiff's physical

impairments revealed only mild or sporadic limitations and symptoms.  (R. 21–22.)

As to Plaintiff's mental impairments, the ALJ found the record "replete with

inconsistencies."  (R. 22.)  For example, at some medical appointments, Plaintiff

presented as mute or unable to communicate and demonstrated minimal functioning.  (R.

22–31.)  A function report completed by a social worker described Plaintiff as "catatonic"

and needing complete assistance in all facets of living.  (R. 29.)  But other medical and

non-medical records described no limitations in functioning, communication difficulties, or mental health concerns.  (R. 23–32.)  A CDI referral and investigation did not resolve the inconsistencies but only produced further conflicting evidence.  (*Id.* at 22.)  The ALJ concluded the only reasonable explanation for the discrepancies was that Plaintiff magnified his symptoms when necessary to support his SSI claim but functioned normally at other times.  (R. 34.)  Consequently, the ALJ concluded at step two that Plaintiff was not disabled and ceased the sequential analysis.  (R. 37.)

The Appeals Counsel denied review of the ALJ's decision, and the ALJ's decision therefore became the final decision of the Commissioner of Social Security.  (R. 1.)

Plaintiff commenced this action for judicial review on May 1, 2020.  The Commissioner filed an answer and the Social Security Administrative Record on September 15, 2020, and Plaintiff filed his motion for summary judgment on November 9, 2020.  Rather than file a cross-motion for summary judgment, which is the procedure prescribed by D. Minn. LR 7.2, the Commissioner moved to remand.  The Court suspended the deadline for the Commissioner's summary judgment motion so that the Court could determine whether the relief requested in the Commissioner's motion to remand aligned with the relief requested in Plaintiff's motion for summary judgment.  (*See* Order at 2 [ECF No. 29].)  The parties did not agree on the scope of remand, so the Court directed the Commissioner to file a motion for summary judgment to respond to all of the issues raised in Plaintiff's motion for summary judgment.  The Commissioner filed that motion on April 26, 2021, and Plaintiff responded on May 10, 2021.

### III.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision.  42 U.S.C. § 405(g).  This standard requires a court to consider not only evidence that supports the ALJ's decision but also evidence that detracts from it.  *See Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted).  The Court may not, however, reverse the ALJ's decision simply because "the record could also have supported an opposite decision."  *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992).  In other words, "if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings," the Court must affirm the decision.  *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

A claimant has the burden to prove disability.  *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995).  The claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The disability, not just the impairment, must have lasted or be expected to last for at least twelve months.  *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

When a claimant seeks judicial review of a final decision by the Commissioner, a court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  A remand under that provision is known as a "sentence four

remand" because the quoted language appears in the fourth sentence of § 405(g). A sentence four remand requires the entry of a final judgment that ends the case. *See Shalala v. Schaefer*, 509 U.S. 292, 297–98 (1993).

## IV.    Discussion

### A.    Whether the ALJ Erred at Step Two

Plaintiff argues the ALJ erred at step two of the sequential disability evaluation process set forth in 20 C.F.R. § 416.920(a)(4) by not finding that Plaintiff has severe, medically determinable impairments of major depressive disorder and PTSD. (Pl.'s Mem. Supp. Mot. Summ. J. at 3–4, 8–10.) Plaintiff faults the ALJ for (1) relying on the CDI report and (2) giving inadequate weight to the opinions of Dr. Kroupin, Dr. Sharma, Dr. Karayusuf, and Dr. Barron.

#### 1.    The CDI Report

The Court begins its discussion of the ALJ's step-two evaluation with the CDI report because of the significance the ALJ gave to it. The ALJ relied on the CDI report in finding the record "replete with inconsistencies," reducing the weight given to the opinions of Dr. Kroupin and Dr. Barron, and discrediting evidence from Plaintiff's social worker and sister-in-law. (R. 22, 26–29, 33–36.)

The Social Security Administration (SSA) established the CDI program to "prevent and detect fraud in SSA's disability programs." Office of the Inspector General, SSA, *Cooperative Disability Investigations*, https://oig.ssa.gov/cooperative-disability-investigations-cdi (last visited June 28, 2021). Plaintiff was referred to the CDI by the Minnesota Department of Disability Services on April 5, 2016, due to conflicting

statements about his communication abilities, ability to be alone or go places alone, hobbies and interests, demeanor and behavior, gait, and right-hand tremor. (R. 363–66.)

The CDI report contained the following historical data. Plaintiff and his spouse entered the United States from Iraq on November 3, 2015. During two new arrival screenings that month, Plaintiff's gait appeared normal, and he appeared healthy, cooperative, and smiling. (R. 366.) Plaintiff indicated he did not feel sad or worry too much in response to two mental health screening questions. (R. 366–67.) But by January 2016, Plaintiff had been referred for psychological services for a severely depressed mood and functional difficulties. (R. 367.)

Plaintiff's sister-in-law attended his medical appointments as a historian and interpreter. (R. 367.) According to Plaintiff's sister-in-law, in 2013 Plaintiff experienced severe shock when his brother was violently murdered by militants in their home. (R. 367.) The sister-in-law reported that Plaintiff did not eat regularly, did not speak or interact with others, and spent most days sitting and staring at the floor. (R. 367.) Plaintiff was diagnosed with depression and PTSD. (R. 367.) By March 2016, Plaintiff was described by various providers as mute, noncommunicative, scared, frozen, quietly sobbing, unable to care for himself in any manner, and with a stooped posture and slow gait. (R. 367–68.)

The CDI report described surveillance of Plaintiff on two dates. On April 22, 2016, a CDI investigator observed Plaintiff leave his apartment twice; once, he appeared to be "working on some sort of project" and handed a piece of material to another person inside. (R. 369.) An apartment manager told investigators on May 5, 2016, that Plaintiff

came to the office about every three weeks when something needed to be fixed in his

apartment.  (R. 369.)  Although Plaintiff did not speak English well, he was able to

communicate the problems to the manager.  (R. 369.)  The manager said that Plaintiff

walked to the office alone and walked the long way back to his apartment.  (R. 369.)

After the investigators left the manager's office, they saw Plaintiff walking back and

forth in the parking lot with no difficulty.  (R. 369.)  One of the investigators approached

and attempted to talk to Plaintiff, and Plaintiff indicated he could not speak English.  (R.

369.)  The investigator asked if Plaintiff was happy, and Plaintiff put his hand to his

chest, smiled, and nodded.  (R. 369.)

A CDI report is not medical evidence.  *Glessing v. Comm'r of Soc. Sec.*, No. 13-

cv-1254 BMC, 2014 WL 1599944, at *11 (E.D.N.Y. Apr. 21, 2014).  But an ALJ may

consider a CDI report as evidence of a claimant's limitations or how a claimant's

symptoms affect the ability to do basic work activities.  *Marva A. v. Comm'r, Soc. Sec.*

*Admin.*, No. 1:17-cv-02385-AJB, 2018 WL 4328198, at *14 (N.D. Ga. Sept. 10, 2018);

SSA Program Operations Manual System DI 33025.036.  The CDI report is often

considered at step four of the sequential evaluation.  *E.g.*, *Brady v. Berryhill*, No. 4:16-

cv-1173 ACL, 2017 WL 4099483, at *7 (E.D. Mo. Sept. 15, 2017) ("The ALJ properly

considered Agent Brady's report as one of many factors in assessing Brady's credibility

and in determining her RFC."); *Marva A.*, 2018 WL 4328198, at *14; *Thibodeaux v.*

*Berryhill*, No. 16-3088-CV-S-ODS, 2017 WL 1968679, at *3 (W.D. Mo. May 12, 2017).

An ALJ may consider an individual's symptoms and functional limitations also at step

two:

> At step 2 of the sequential evaluation process, we determine whether an individual has a severe medically determinable physical or mental impairment or combination of impairments that has lasted or can be expected to last for a continuous period of at least 12 months or end in death. . . .  At this step, we will consider an individual's symptoms and functional limitations to determine whether his or her impairment(s) is severe . . . .

*See* SSR 16-3p, 2016 WL 1119029, at *10 (Mar. 16, 2016).

Plaintiff argues that the ALJ erred by relying on the CDI Report because it does not refute the substantial weight of medical evidence in the record as a whole.  (Pl.'s Mem. Supp. Mot. Summ. J. at 33.)  Plaintiff also takes issue with the brevity and quality of the investigators' two observations of Plaintiff and characterizes the information obtained from the apartment manager as unreliable double hearsay.  (*Id.*)

Beginning with Plaintiff's hearsay argument, hearsay evidence is admissible and may be considered in a disability determination proceeding.  *See* 42 U.S.C. § 405(b)(1) ("Evidence may be received at any hearing before the Commissioner of Social Security even though inadmissible under rules of evidence applicable to court procedure."); *Richardson v. Perales*, 402 U.S. 389, 410 (1971) ("Hearsay, under [the Social Security] Act, is . . . admissible up to the point of relevancy.").  An ALJ may consider a CDI report that contains hearsay.  *See Michael G. C. v. Comm'r of Soc. Sec.*, No. C18-5875 TLF, 2019 WL 6907790, at *8 (W.D. Wash. Dec. 19, 2019); *Burgin v. Berryhill*, No. 16-cv-1082-C, 2017 WL 4249729, at *5 (W.D. Okla. Sept. 1, 2017), *R. & R. adopted sub nom. Bergin v. Berryhill*, 2017 WL 4248874 (W.D. Okla. Sept. 25, 2017).  Although Plaintiff argues the hearsay is unreliable because the CDI report does not contain the name of and contact information for the apartment manager and maintenance man or attach a separate

written statement from those individuals, Plaintiff does not explain why those missing items necessarily render the hearsay unreliable.  Furthermore, the legal authority cited by Plaintiff, *McClees v. Sullivan*, 879 F.2d 451 (8th Cir. 1989), is inapposite.  In *McClees*, the court deemed unreliable an anonymous interview summary from an unidentified hearing officer.  *Id.* at 453.  The report did not identify the interviewee and was not signed; thus, the claimant could not subpoena or question the interviewer.  *Id.*  Here, however, the CDI report discloses the names of the investigators, and if Plaintiff's counsel had wanted to independently question the manager or maintenance worker at the apartment complex where Plaintiff lived, it would have been a simple matter for counsel to ascertain their identities and do so.  Finally, the ALJ explained that he gave "some weight" to the apartment manager's statements about Plaintiff because she had directly interacted with Plaintiff on numerous occasions and her statements were supported by consistent details about Plaintiff's behavior.  (R. 28.)  This explanation indicates the ALJ considered the reliability of information provided by the apartment manager.

With respect to the brevity and quality of the observations described in the CDI report, it is the ALJ's duty to weigh and resolve any inconsistencies in the evidence.  *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007); *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006).  Here, the ALJ described the discrepancies between the CDI report and other evidence of record, the most notable of which were Plaintiff's ability to communicate and interact, ability to walk, overall level of functioning, and need for round-the-clock care and assistance in all daily activities.  (R. 27–28.)  The ALJ conceded, however, that the CDI report did not explain the discrepancies and, for the

most part, did "not reflect opinions about functional limitations." (R. 28.) The ALJ gave "some weight" to the investigators' lay opinion that Plaintiff appeared to be happy and "some weight" to the apartment manager's description of Plaintiff's behavior. (R. 28.)

As a *general* matter, the Court finds the ALJ did not err by considering the CDI report. The ALJ correctly summarized the findings of the report, accounted for any shortcomings, and gave good reasons for assigning the weight to the lay opinions expressed therein. Plaintiff has not shown that the number or quality of observations by the investigators was necessarily inadequate or that the investigators observed Plaintiff during a particularly unusual period of high functioning. The Court will consider the ALJ's *specific* use of the CDI report to discount the weight given other evidence in the discussion of that specific evidence below.

### 2. Dr. Sharma

The parties agree that the ALJ erred in considering evidence from Plaintiff's treating psychiatrist, Dr. Sharma. (Pl.'s Mem. Supp. Mot. Summ. J. at 10, 17–19; Def.'s Reply Mem. Supp. Mot. Remand at 5.) But Plaintiff asks for an outright award of benefits, while Defendant asks for a remand for further proceedings.

Dr. Sharma treated Plaintiff four times. (R. 341–47, 386–88, 501–04.) Dr. Sharma described Plaintiff as nonverbal, frozen, traumatized, emotionally distressed, depressed, anxious, and completely noninteractive. (R. 341–43.) He attributed Plaintiff's "traumatic shock" to his brother's murder. (R. 341, 343.) Dr. Sharma diagnosed Plaintiff with PTSD and a major depressive disorder. (R. 343.) Dr. Sharma's objective findings and diagnoses were generally consistent at all four visits. Dr. Sharma prescribed

Remeron, which improved Plaintiff's symptoms somewhat, and Zoloft. (R. 387, 502–03.)

Although the ALJ summarized some of the evidence from Dr. Sharma (R. 25–26), the ALJ did not consider Dr. Sharma's March 7, 2016 treatment note or assign weight to any of Dr. Sharma's opinions, as required by 20 C.F.R. § 416.927(c). Accordingly, the Court recommends that the Commissioner's decision be reversed and the case be remanded with directions to consider the March 7, 2016 treatment note and to assign and explain the weight given to Dr. Sharma's opinions. The Court further recommends that the ALJ be instructed to re-evaluate whether the evidence, including the evidence from Dr. Sharma, supports a finding that Plaintiff has a medically determinable mental impairment. The Commissioner concedes that, on remand, the ALJ may need to reevaluate whether Plaintiff has a *severe*, medically determinable impairment, depending on the weight given to Dr. Sharma's opinion.

The Court does not recommend that the case be reversed and remanded for an outright award of benefits based on the ALJ's failure to consider Dr. Sharma's opinions at step two. There is no regulatory or administrative provision for establishing disability at step two; the only determination is whether a claimant suffers from a severe medically determinable impairment. *See* 20 C.F.R. § 416.920(a)(4)(ii) ("At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled."). The claimant's burden to

show a severe impairment at step two is *de minimis*. *Hudson v. Bowen*, 870 F.2d 1392, 1395 (8th Cir. 1989). It is not the same as establishing disability.

Moreover, except in rare circumstances, a case should be remanded for further proceedings rather than for an award of benefits. A court may remand for an award of benefits only when "the clear weight of the evidence fully supports a determination [the claimant] is disabled." *Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir. 2009). But it is not for this Court to make in the first instance determinations at steps three, four, or five that are necessary to find disability. Here, remand for further proceedings is appropriate because the ALJ ended his analysis at step two of the five-step disability review process; disability cannot be established at step two; and there are several issues (*i.e.*, whether Plaintiff's impairments meet or equal a listed impairment and Plaintiff's residual functional capacity) that must be resolved at the administrative level before Plaintiff can be found disabled and entitled to benefits. *See Robert W. G. v. Berryhill*, No. 18-cv-49-BU-JCL, 2019 WL 2403198, at *4 (D. Mont. June 7, 2019).

### 3.     Other Medical Providers and Evidence

Before proceeding to the ALJ's consideration of other medical source evidence, a review of the policies and principles applicable to the step-two determination is helpful. SSR 85-28 sets forth "the policy for determining when a person's impairment(s) may be found 'not severe' and, thus, the basis for a finding of 'not disabled' in the sequential evaluation of disability." SSR 85-28, 1985 WL 56856, at *1 (1985). The severity determination at the second step is based only on medical evidence. *Id.* at *4.

The severity requirement cannot be satisfied when medical evidence shows

that the person has the ability to perform basic work activities, as required
in most jobs. Examples of these are walking, standing, sitting, lifting,
pushing, pulling, reaching, carrying or handling; seeing, hearing, and
speaking; understanding, carrying out, and remembering simple
instructions; use of judgment, responding appropriately to supervision,
coworkers, and usual work situations; and dealing with changes in a routine
work setting. Thus, these basic work factors are inherent in making a
determination that an individual does not have a severe medical
impairment.

*Id.* at *3. Determining that an impairment is not severe requires the ALJ to carefully

evaluate "the medical findings which describe the impairment(s) and [make] an informed

judgment about its (their) limiting effects on the individual's physical and mental

ability(ies) to perform basic work activities." *Id.* at *4. To that end, "an assessment of

function is inherent in the medical evaluation process itself." *Id.* Finally, "[g]reat care

should be exercised in applying the not severe impairment concept." *Id.* If the ALJ

cannot clearly determine the impact of an impairment on a claimant's ability to do basic

work activities, the ALJ should continue with the sequential evaluation. *Id.*

### a. Dr. Kroupin

Dr. Georgi Kroupin treated Plaintiff from January 2016 until December 2017, then

again in late 2018. Plaintiff was referred to Dr. Kroupin by his primary care provider,

Cherisse C. Sardon Garrity, C.N.P., for "severely depressed mood and general

functioning difficulties." (R. 316, 318.) Plaintiff's sister in-law acted as his interpreter

and historian during the appointment. (R. 318.) She told Dr. Kroupin that Plaintiff had

arrived in the United States about a month before, had "experienced severe shock when

his brother was murdered in front of him two years ago," and had since refused to talk,

cried every day, and needed assistance with basic needs. (R. 318.) Dr. Kroupin

diagnosed Plaintiff with PTSD and severe depression. (R. 318.) Less than a month after that appointment, Dr. Kroupin completed a check-the-box Medical Opinion form, on which he noted diagnoses of severe depression and PTSD, and limitations of major memory and concentration problems, and opined that Plaintiff could not work in the foreseeable future. (R. 321.)

Plaintiff's sister-in-law attended subsequent appointments with Plaintiff as an interpreter and historian. (*E.g.*, R. 360, 385, 393.) She described Plaintiff as frequently crying, not interacting with family members for days at a time, and refusing to leave his room. (R. 395, 397.) Plaintiff routinely appeared to Dr. Kroupin as withdrawn, depressed, uncommunicative, and unresponsive. (*E.g.*, 360, 389, 393, 394.) By September 2017, however, Plaintiff's sister-and-law reported that Plaintiff had begun gardening and walking with family members. (R. 451.) In December 2017, Plaintiff reported he was talking directly more often to providers and family members, and Dr. Kroupin recorded that Plaintiff was more active in the session. (R. 500.) However, Plaintiff said he still felt scared, had increased nightmares and flashbacks, and had intrusive traumatic thoughts. (R. 500.)

Several months passed between office visits due to Plaintiff's sister-in-law's inability to drive him to appointments. (R. 519.) In August 2018, Plaintiff began using a few words to communicate directly with Dr. Kroupin. (R. 486.) In September 2018, Plaintiff told Dr. Kroupin, with his sister-in-law interpreting, that he was scared all the time and felt he was going to be attacked. (R. 484.) Dr. Kroupin was able to use behavioral techniques to mitigate Plaintiff's anxiety and depression. (R. 484.) Dr.

Kroupin added anxiety to Plaintiff's diagnoses.  (R. 485.)

Dr. Kroupin completed a sworn declaration on October 9, 2018.  (R. 518–23.)  He described his treatment of Plaintiff and Plaintiff's slight progress.  He explained that Plaintiff's sister-in-law served as the interpreter during their sessions because initial attempts to use a paid interpreter were not successful.  (R. 519.)  Dr. Kroupin also addressed the CDI report and said that activities the investigators had observed were not inconsistent with Plaintiff's diagnoses of depression and PTSD.  (R. 520.)  Dr. Kroupin was not surprised that Plaintiff had placed his hand on his chest and nodded after the investigator asked him if he was happy, because Plaintiff always placed his hand on his chest and indicated he understood the speaker whether he actually did or not.  (R. 521.)  Dr. Kroupin also addressed some of the discrepancies between his treatment records and those of Ms. Sardon Garrity.  (R. 521.)  He noted that Ms. Sardon Garrity's records did not address mental health or contain any behavioral observations.  (R. 521.)  Dr. Kroupin attested that one of Plaintiff's major impairments was his inability to initiate activities or self-care.  (R. 522.)  Plaintiff did not want to care for himself because of the trauma he had endured.  (R. 522.)

Dr. Kroupin submitted a supplemental declaration on November 5, 2018, in which he expressed further concern with Ms. Sardon Garrity's report because of the short amount of time she had spent with Plaintiff, her focus on Plaintiff's physical conditions, and her failure to mention the presence and input of Plaintiff's sister-in-law.  (R. 637.)

Dr. Kroupin provided a second supplemental declaration to the Appeals Council

on May 6, 2019.[3]  (R. 43–46.)  Dr. Kroupin specifically addressed the resettlement and refugee screening records and explained the basis for his diagnosis of PTSD.

The opinion of a treating medical source such as Dr. Kroupin should be given controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 416.927(c)(2).  An ALJ must consider the following factors when weighing a medical opinion: the existence of an examining relationship, the nature of the treatment relationship, the degree to which the opinion is supported by other medical evidence, consistency with the record, the source's specialty, and any other relevant factors.  20 C.F.R. § 416.927(c).  The ALJ is not required to explicitly discuss each and every factor, as long as he considers all the factors and gives good reasons for the weight assigned.  *See Combs v. Colvin*, No. 8:12-cv-429, 2014 WL 584741, at *11 (D. Neb. Feb. 12, 2014); *Derda v. Astrue*, No. 4:09-cv-1847 AGF, 2011 WL 1304909, at *10 (E.D. Mo. Mar. 31, 2011).

### i.    Dr. Kroupin's Check-the-Box Form

The ALJ gave little weight to the check-the-box form completed by Dr. Kroupin on February 12, 2016, because the form indicated major memory and concentration problems, as well as a mental diagnosis, that Dr. Kroupin had not mentioned previously.

---

[3] Where a claimant submits new evidence and "the Appeals Council considers the new evidence but declines to review the case, [federal courts] review the ALJ's decision and determine whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision."  *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992).  Here, the Appeals Council reviewed the new evidence and determined it would not change the outcome of the ALJ's decision.  (R. 2.)

(R. 36.)  The ALJ did not err in that respect.  There is no medical evidence of major memory or concentration problems in the record.  The ALJ also discounted Dr. Kroupin's statement that Plaintiff was precluded from employment due to his mental limitations. (R. 36.)  The ALJ did not err in that respect because the determination that a claimant is unable to work is reserved for the Commissioner to make.  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).  Finally, the ALJ reduced the weight given the form overall because the conclusions reached therein were not supported by medical evidence or elaboration.  Check-the-box forms are indeed of "little evidentiary value" when, as here, they cite no medical evidence and provide no elaboration.  *Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018).

### ii.    Dr. Kroupin's October 2018 Declaration

The ALJ gave only partial weight to Dr. Kroupin's October 2018 declaration.  One reason was that Dr. Kroupin did not explain the inconsistencies between his opinion reflecting debilitating and ongoing trauma and other reports of normal functioning that had been observed during other medical visits and described in the CDI report, including the interactions Plaintiff had with the apartment manager.  (R. 36.)  To the contrary, Dr. Kroupin did explicitly address and explain the discrepancies between his opinion and refugee screening records, the CDI investigation, Ms. Sardon Garrity's progress notes, and Plaintiff's interactions with the building manager.  (R. 520–21.)  The ALJ erred in failing to consider that evidence and concluding otherwise.

Another reason the ALJ provided for giving partial weight to the October 2018 declaration was the involvement of Plaintiff's sister-in-law as interpreter and historian

during the appointments.  (R. 35.)  It is undisputed that Plaintiff does not speak English and that his sister-in-law routinely functioned as his interpreter during medical appointments.  (*E.g.*, R. 337, 360, 393.)  Plaintiff's inability to speak English is not a reason to discount Dr. Kroupin's opinion.  As to Plaintiff's sister-in-law's role as historian, the Commissioner does not suggest who else could have provided information about Plaintiff's background, home life, and activities of daily living to Dr. Kroupin.  Plaintiff was uncommunicative at most appointments, and as Plaintiff's primary caregiver at home, his sister-in-law was well-suited to provide that information.  Further, the ALJ did not consider recent evidence from Dr. Kroupin that Plaintiff had started communicating directly with Dr. Kroupin (but still with his sister-in-law as interpreter) at recent appointments in late 2018.  (R. 518–19.)  Thus, the ALJ's statement that Dr. Kroupin simply relayed information provided by Plaintiff's sister-in-law (R. 35) is not accurate.

A third reason the ALJ gave only partial weight to Dr. Kroupin's October 2018 declaration was that the opinion did not mention Plaintiff's period of higher functioning before he arrived in the United States or Plaintiff's sister-in-law's recent theory that Plaintiff's functioning may have decreased a week or two after his arrival after he learned he would not be reunited with his deceased brother in the United States.  (R. 36.)  The ALJ noted that Dr. Kroupin may not have had an opportunity to assess the new theory.  (R. 36.)  If so, Dr. Kroupin would have an opportunity to assess the new theory on remand.  The Court therefore recommends that Plaintiff be allowed to provide an additional declaration from Dr. Kroupin to the ALJ concerning this issue.  With respect to

Plaintiff's reportedly higher functioning before his arrival in the United States, Dr. Kroupin's May 2019 declaration may provide the explanation the ALJ found lacking, and the ALJ should reconsider that declaration on remand.

Finally, the ALJ discounted the weight given to Dr. Kroupin's October 2018 declaration in part because it was not consistent with the "normal functioning" described in the CDI report. (R. 35.) The ALJ cited Plaintiff's reported ability to leave his apartment independently to deliver a check or request maintenance as "well beyond the claimant's alleged functioning at this time." (R. 36.) But the CDI report is not medical evidence. Thus, although it can be used to discount medical evidence, it cannot in and of itself constitute medical evidence of normal functioning. Consequently, the ALJ erred in relying on the CDI report as medical evidence of functioning in his consideration of Dr. Kroupin's October 2018 declaration at step two.

In sum, the Court finds the ALJ erred in some significant aspects of his evaluation of Dr. Kroupin's October 2018 declaration. Given the errors described above, the Court does not find that the ALJ's decision to give only partial weight to this opinion is supported by substantial evidence on the record as a whole. The Court recommends that the case be remanded for additional consideration of Dr. Kroupin's October 2018 declaration, including any supplemental declaration from Dr. Kroupin that Plaintiff provides.

### iii.    Dr. Kroupin's November 2018 Declaration

The Court turns now to Dr. Kroupin's supplemental declaration from November 2018, which the ALJ gave little weight. The ALJ found fault with the opinion because

the Dr. Kroupin did not explain the discrepancies between his opinion and the medical records from Ms. Sardon Garrity in November 2015. (R. 35.) But the ALJ's findings in support of this conclusion are inconsistent. On one hand, the ALJ stated that Dr. Kroupin failed to explain why Dr. Sardon Garrity did not mention any mental functioning limitations in her November 2015 progress notes, but on the other hand, the ALJ stated that Dr. Kroupin explained it was because Ms. Sardon Garrity did not administer the clinic's mental health screening tool and asked only two questions about mental health. (R. 35.)

The ALJ also questioned why Ms. Sardon Garrity would not have recorded low mental functioning in her progress notes, implying this was inconsistent with Dr. Kroupin's opinion. (R. 35.) But it is clear from Ms. Sardon Garrity's November 2015 progress notes that she focused almost exclusively on Plaintiff's physical condition. (R. 298–315, 335.) Ms. Sardon Garrity's treatment record from November 12, 2015 states: "Mental Health: not evaluated." (R. 303.) Ms. Sardon Garrity asked only two mental-health screening questions at a follow-up appointment on November 25, 2015. (R. 311.) Thus, it is not surprising that she did not report low mental functioning in her November 2015 records. Moreover, in March 2016, Ms. Sardon Garrity did record symptoms of low functioning such as not speaking and looking downward during the appointment. (R. 353.) On the whole, substantial evidence does not support the ALJ's decision to give little weight to Dr. Kroupin's November 2018 opinion because of Ms. Sardon Garrity's records.

Contrary to the ALJ's finding—a finding on which the ALJ also based his

decision to give little weight to Dr. Kroupin's November 2018 opinion—the record is clear that it was Ms. Sardon Garrity who referred Plaintiff to Dr. Kroupin for mental health treatment.  On the initial treatment record from Dr. Kroupin, Ms. Sardon Garrity is named as Plaintiff's primary care provider; the referral for "adjustment issues" was electronically signed, ordered, and authorized by Ms. Sardon Garrity; and Dr. Kroupin wrote, "Patient referred by his primary care physician because of severely depressed mood and general functioning difficulties."  (R. 316, 318.)  With respect to the ALJ's remark that the basis for the referral could have originated with Plaintiff's sister-in-law, that was not a reason to necessarily discount the validity of the referral, considering that Plaintiff did not speak English and his sister-in-law routinely served as his interpreter and medical historian.  Thus, the ALJ's decision to give little weight to Dr. Kroupin's November 2018 opinion because of the uncertain source of the referral is not based on substantial evidence on the record as a whole.

The ALJ gave little weight to Dr. Kroupin's November 2018 opinion also because it did not account for normal functioning noted in June 2017 in the medical examination for the U.S. Department of State or normal abilities described at an eye appointment and medical visit in 2017.  (R. 35.)  With respect to the medical examination for the Department of State, Dr. Kroupin explained in his May 2019 declaration that discrepancies in Plaintiff's mental functioning are due to his predominantly negative symptoms, meaning that Plaintiff is a quiet person by nature whose pain is internalized and whose symptoms are not manifested overtly.  (R. 43.)  In addition, mental health screening was not a part of the medical examinations for refugees.  (R. 44.)  The Court

that finds Dr. Kroupin's May 2019 declaration addresses the discrepancies between his November 2018 declaration and the Department of State medical examination and should be considered by the ALJ on remand.

As to the "apparently normal abilities" described at an eye appointment and medical visit in 2017, the Court presumes there was no mental health component to the eye appointment, and the ALJ did not provide a record cite to the "2017 medical visit." Thus, the first record does not provide substantial evidence in support of the ALJ's decision to give little weight to the November 2018 opinion, and the Court is not able to reach a conclusion as to the other.

In sum, the Court finds the ALJ erred in giving little weight to Dr. Kroupin's November 2018 declaration. The Court recommends that the ALJ be instructed to reconsider Dr. Kroupin's November 2018 declaration for the reasons explained herein, as well as consider in the first instance Dr. Kroupin's May 2019 declaration, on remand.

### b.    Dr. Karayusuf

Dr. Alford Karayusuf conducted a psychiatric evaluation of Plaintiff in March 2016 at the request of the SSA. (R. 323.) Plaintiff was accompanied by his sister-in-law and an interpreter. (R. 323.) Dr. Karayusuf recorded Plaintiff's chief complaint as being "mute" and not having spoken since 2013. (R. 323.) Plaintiff's sister-in-law served as Plaintiff's historian. Dr. Karayusuf wrote that Plaintiff did not answer any questions or say anything, including his name, and all details about Plaintiff's functioning came from his sister-in-law. (R. 323, 324.) Dr. Karayusuf observed a "Parkinsonian tremor" in Plaintiff's right hand, which indicated to Dr. Karayusuf a neurological disorder. (R. 323.)

24

Plaintiff's sister-in-law reported that Plaintiff was completely uncommunicative and helpless. (R. 324.) According to her, Plaintiff did not speak, bathe, do chores, play games, read, watch television, or socialize. (R. 324.) He simply sat idle all day looking at the floor. (R. 324.) Dr. Karayusuf's observations during the mental status part of the evaluation were that Plaintiff was sad, was not capable of cooperating in the evaluation, and "showed a moderate-to-severe psychomotor retardation." (R. 324.) The doctor "genuinely [felt] that this man's mutism is a function of severe trauma and not willful nor is he malingering." (R. 324.) Dr. Karayusuf's conclusions were that Plaintiff could not understand, remember, or follow instructions; could not interact with coworkers or the public; and could not maintain pace or persistence. (R. 325.) Plaintiff's diagnoses were PTSD and severe depression, and his prognosis was poor. (R. 324.)

The ALJ gave little weight to Dr. Karayusuf's opinion due to "substantial discrepancies" between Plaintiff's presentation at the appointment and "reports to Dr. Karayusuf," "prior records," and "other instances since that time." (R. 23.) These vague references to the record fall short of giving good reasons for the little weight assigned to the opinion, and the case should be remanded for a more robust explanation supported by specific substantial evidence of record.

The ALJ identified only two specific discrepancies between Dr. Karayusuf's opinion and the record: the tremor in Plaintiff's hand and "slowing," both of which the ALJ said had not been present in 2015. (R. 23.) Plaintiff's first medical appointment in the United States was not until mid-November 2015, so there is little in the way of medical evidence from that year. Thus, the Court looks at evidence from 2016 as well,

25

and several records from Dr. Sharma and other providers in 2016 document Plaintiff's slow movement. (R. 342, 375, 387, 390, 397.) Depending on the weight accorded to those records on remand, the ALJ may reconsider whether to reduce the weight given Dr. Karayusuf's based on discrepant reports of slowness.

Regarding the hand tremor, the Court agrees there is little, if any, other medical evidence of the tremor and no diagnosed condition to which the tremor could be attributed. But the tremor is a physical condition, not a mental one, and thus has minimal relevance to Dr. Karayusuf's observations and clinical findings pertaining to Plaintiff's PTSD and depression. And even if Dr. Karayusuf's opinion should be discounted because of this discrepancy, giving the opinion only little weight for that reason alone goes too far.

In concluding, it is worth noting that Dr. Karayusuf's opinion was largely consistent with Dr. Kroupin's opinions, which the Court has found the ALJ erred in discounting. Plaintiff's appearance and manifestation of symptoms was similar during examinations by both doctors, and both doctors found Plaintiff capable of only low functioning. For this reason, and the other reasons set forth above, the Court concludes that substantial evidence does not support the ALJ's decision to give little weight to Dr. Karayusuf's opinion, and the ALJ should reconsider Dr. Karayusuf's opinion on remand in light of the errors identified above.

### c.    Dr. Barron

Dr. Craig Barron conducted a consultative psychological evaluation of Plaintiff in June 2016. (R. 375.) At the request of the Minnesota Department of Disability Services,

Plaintiff's sister-in-law was not allowed into the examination room, but an independent interpreter was present. (R. 375.) Plaintiff whimpered, refused eye contact, and was completely mute during the examination. (R. 375.) Dr. Barron found it "[t]he extent of any mental health issues was impossible to ascertain due to his inability to respond either verbally or nonverbally." (R. 375.) Dr. Barron found it "troubling" that Plaintiff's sister-in-law did all the talking during Plaintiff's psychotherapy sessions with Dr. Kroupin, but Dr. Barron did not disagree with Dr. Kroupin's diagnoses of PTSD and depression. (R. 376.) He found Plaintiff's history and apparent "consistency in his presentation" consistent with those diagnoses. (R. 375.)  Dr. Barron's conclusions also correlated with those of Dr. Karayusuf. (R. 376.)

The ALJ gave Dr. Barron's opinion little weight because of "substantial discrepancies in the claimant's presentation and the reports to Dr. Barron with the records from 2015 and the CDI report." (R. 29.) That is the extent of the ALJ's explanation for the weight given the opinion.

As with the ALJ's treatment of Dr. Karayusuf's opinion, the ALJ's vague references to the record fall short of giving good reasons for the little weight assigned to Dr. Barron's opinion. That said, the Court agrees that Dr. Barron's opinion concerning the extent of Plaintiff's mental health issues, limitations, and functioning was entitled to little weight. Dr. Barron conceded he was not able to offer an opinion on Plaintiff's mental condition when he wrote that Plaintiff's mental health condition and limitations were "impossible to ascertain." Accordingly, substantial evidence supports the ALJ's consideration of Dr. Barron's opinion and the weight assigned.

### d.    Other Medical Records

Plaintiff cites to several medical records presumably to demonstrate consistent documentation of PTSD, depression, limited communication abilities, poor eye contact, reliance on his family, isolation, difficulty sleeping, and nightmares.  (Pl.'s Mem. Supp. Mot. Summ. J. at 21–23.)  Plaintiff only describes the content of these records, however, and does not identify any error in the ALJ's consideration of the records.  (*Id.*)  The Court's discussion of these records will be brief.  First, the Court will not make arguments on Plaintiff's behalf.  Second, the evidence contained in those records is largely duplicative of other evidence that the Court has already discussed and need not discuss further.

Plaintiff also cites to predeparture and refugee resettlement records and notes they contain little information about his mental functioning in 2015.  (*Id.* at 23–24.)  Again, Plaintiff does not identify any particular error in the ALJ's consideration of the records but seems to take general issue with the ALJ's reliance on the records to discount the weight given to medical evidence from Plaintiff's providers.  An ALJ must consider all relevant evidence in the record and resolve any inconsistencies.  *See Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007).  The resettlement and predeparture records contained information about home visits and a case worker's personal observations of Plaintiff in late 2015 and early 2016 (R. 563–57), Plaintiff's description of general health before he departed Iraq (R. 590), a Department of State Medical Examination form (R. 641), and a Department of State Physical Examination Worksheet that included categories for mental disorders, mobility, and communication abilities (R. 652–56).  These records were

relevant, and the ALJ did not err in considering them or in identifying the inconsistencies between those records and other evidence of record.

**B.    Whether Plaintiff Should Be Found Disabled Under a Special Vocational Profile Described in 20 C.F.R. § 416.962(b)**

Plaintiff argues that *if* the ALJ had found a severe, medically determinable impairment at step two, the ALJ would have had to apply and find Plaintiff eligible for SSI under a special vocational profile described in 20 C.F.R. § 416.962(b),[4] due to his severe impairments, age, inability to speak or understand English, and lack of prior relevant work experience. (Pl.'s Mem. Supp. Mot. Summ. J. at 4, 24–28.) Plaintiff asks this Court to apply § 416.962(b) and find him disabled. The Court recommends against doing so. If the matter is remanded as recommended, and if the ALJ determines that Plaintiff has a severe, medically determinable impairment, the ALJ will be in the best position to determine in the first instance whether and how to apply § 416.962(b).

**C.    Whether Plaintiff Should be Found Disabled at Step Three or Step Five**

Alternatively, Plaintiff asks the Court to find him disabled at step three or step five

---

[4] Title 20 C.F.R. § 416.962(b) provides:

> If you are at least 55 years old, have no more than a limited education, and have no past relevant work experience. *If you have a severe, medically determinable impairment(s)* (see §§ 416.920(c), 416.921, and 416.923), are of advanced age (age 55 or older, see § 416.963), have a limited education or less (see § 416.964), and have no past relevant work experience (see § 416.965), we will find you disabled. If the evidence shows that you meet this profile, we will not need to assess your residual functional capacity or consider the rules in appendix 2 to subpart P of part 404 of this chapter.

(Emphasis added.)

of the sequential disability evaluation process. (Pl.'s Mem. Supp. Mot. Summ. J. at 36–38.) Again, the Court recommends against doing so. If the case is remanded as recommended, and if the ALJ determines that Plaintiff has a severe, medically determinable impairment, the ALJ will be in the best position to proceed with steps three, four, and five of the sequential evaluation.

Accordingly, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment [ECF No. 16] be **GRANTED IN PART** and **DENIED IN PART** as set forth fully herein;

2. Defendant's Motion to Remand [ECF No. 24] be **GRANTED**;

3. Defendant's Motion for Summary Judgment [ECF No. 36] be **DENIED**;

4. The final decision of the Commissioner of Social Security be **REVERSED** and the case be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), with the following directives:

   a. The ALJ must consider Dr. Sharma's March 7, 2016 treatment note and assign weight to Dr. Sharma's opinions, explain the weight given to those opinions, and give specific reasons for the weight assigned;

   b. The ALJ must reconsider Dr. Kroupin's October 2018 declaration in light of the errors described herein;

   c. The ALJ must consider Dr. Kroupin's May 2019 declaration in light of the errors described herein;

   d. Plaintiff may submit an additional declaration from Dr. Kroupin concerning

the decrease in Plaintiff's functioning a week or two after his arrival in the United States after he learned he would not be reunited with his deceased brother;

   e. The ALJ must reconsider Dr. Karayusuf's opinion in light of the errors described herein;

   f. The ALJ must re-evaluate whether Plaintiff has a medically determinable mental impairment and, if so, whether that impairment is severe; and

5. **JUDGMENT SHOULD BE ENTERED ACCORDINGLY.**

Dated: July 1, 2021                 *s/ Hildy Bowbeer*
                               HILDY BOWBEER
                               United States Magistrate Judge

## NOTICE

     This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).